549 So.2d 275 (1989)
LOUISIANA STATE BAR ASSOCIATION
v.
Margaret G. Ford WILLIAMS.
No. 88-B-1311.
Supreme Court of Louisiana.
September 12, 1989.
Thomas O. Collins, Jr., New Orleans, Anne Lacour Neeb, Gerard F. Thomas, Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, Trevor G. Bryan, Elizabeth A. Alston, New Orleans, Christine Lipsey, Baton Rouge, Edmund McCollam, Houma, William W. Hall, Gretna, for applicant.
Margaret Gibson Williams, for respondent.
DENNIS, Justice.[*]
This is an attorney disciplinary proceeding in which the bar association seeks to have this court disbar the respondent attorney, Margaret G. Ford Williams, alleging that in two separate instances of misconduct she converted several thousand dollars of her clients' funds, and in three other *276 instances neglected legal matters entrusted to her. We find that respondent converted her clients' funds on two occasions and neglected a client's legal matter in a third case. After considering aggravating and mitigating circumstances, we impose a sanction of disbarment.

SPECIFICATIONS OF MISCONDUCT

1. Conversion of Donna and James Nettles' Funds

The bar association alleges that respondent violated several articles of the Code of Professional Responsibility in her representation of Ms. Donna Nettles and her minor son, James Nettles. Specifically, the bar association alleges that respondent violated DR 2-110(A)(3), which states that an attorney who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned; DR 1-102(A)(3), which provides that an attorney shall not engage in illegal conduct involving moral turpitude; DR 9-102(B)(1), (3), and (4), which provide that an attorney shall promptly notify a client of the receipt of his funds, maintain complete records of all funds and render appropriate accounts to his client regarding them, and promptly pay the funds to the client as requested by the client; and DR 6-101(A)(3), which states that an attorney shall not neglect a legal matter entrusted to him.
Respondent had been retained to represent Ms. Donna Nettles and her minor child, James Nettles, in a personal injury case. A settlement was reached and respondent received two separate drafts, each for approximately $23,000, on behalf of Ms. Nettles and James. Ms. Nettles was incarcerated at St. Gabriel State Prison. To facilitate the compromise of the minor's claim, respondent obtained the qualification of the child's father, James Hudson, as the minor's tutor.
Respondent was requested by Ms. Nettles to set up a "trust fund" for the minor child, James Nettles, and to deposit $10,000 of the settlement funds in the account. Without obtaining the approval of the tutor, undertutor or the court, respondent deposited $10,000 of the minor's funds with IDS Financial Services, Inc. in November of 1985. Contrary to Ms. Nettles' intention, respondent designated herself as custodian of the account, giving herself complete control of the minor's funds. Beginning in February, 1986, Respondent obtained approximately $8,000 from the account through a series of withdrawals and loans. The respondent claimed at the hearing before the Commissioner to have documentation showing permission from Ms. Nettles to make these transactions although she failed to produce any evidence of it from Ms. Nettles or from the child's father.
Ms. Nettles directed respondent to place $3,000 of her own settlement funds into a similar account, and further directed respondent to file a petition to change her son's last name. Respondent agreed to undertake these tasks but never did so.
The record reflects that Ms. Nettles, while in prison, made several unsuccessful demands to respondent for an accounting of these funds before filing a complaint with the Committee.
On December 25, 1986, after these disciplinary proceedings had been instituted, respondent visited Ms. Nettles in prison and persuaded her to sign a number of receipts back-dated to 1985 stating that Ms. Nettles had received several "advances" from respondent on her personal injury claim; these sums totalled $4600. Ms. Nettles testified that respondent explained to her that this evidence was necessary to "clear her" in the disciplinary proceeding, and that if her license to practice law were revoked, she would never be able to repay Ms. Nettles the money that she owed her. At the same time, at Ms. Nettles' insistence, respondent executed a counter-document which stated:
"On December 25, 1986 I Margaret G. Ford visited Donna Nettles # 112766. I, Margaret G. Ford, owe Donna Nettles the sum of $4600.00 as of this date, in consideration of her signing papers dates of: March 8, 1985$300.00 April 4, 1985$1,000.00 May 18, 1985$300.00 January 9, 1985 $3,000.00, saying that she received *277 this amount for the purpose of responding to a complaint filed by Donna Nettles. As of this date December 25, 1986, I Margaret G. Ford have not paid the $4600.00.
 Signed,
 Margaret G. Ford"
At the hearing before the Committee held on February 1, 1988, respondent introduced the "receipts" signed by Ms. Nettles into evidence. When confronted by the Committee's attorney with the counter-document, respondent admitted her signature on it but invoked her 5th Amendment privilege when asked to explain it. Later, at the hearing before the Commissioner on October 14, 1988, respondent stated with regard to the "receipts":
"Because I was irresponsible and listened to somebody and did something real dumb when I did those. I had Donna sign those things somebody recommended that to me, and I was dumb enough to follow that but I did, but I would prefer to tell you that than be caught in a lie."
Although there are gaps in the record, making it impossible to determine exactly how much of the Nettles' settlement funds respondent took for her own use or exactly how much she has paid back, at the hearing held before the Commissioner, respondent admitted that she had converted $4600 of the Nettles' settlement funds for her own use and has not made restitution of that amount.
In light of the respondent's admissions, as well as the testimony of Ms. Nettles and an employee of IDS Financial Services, we find that the evidence is clear and convincing that respondent violated: DR 1-102(A)(3), DR 9-102(B)(3), and DR 9-102(B)(4) in that she converted client funds to her own use and did not turn over those funds or render an accounting of them when requested by her client to do so.

2. Conversion of the Austins' funds

The bar association alleges that respondent violated DR 1-102(A), which generally states that an attorney shall not engage in illegal conduct involving moral turpitude or conduct involving dishonesty, fraud, or deceit; DR 9-102(A)(2), which states that an attorney must preserve the identity of funds he receives on behalf of a client by depositing them in a separate, identifiable clients' account; and DR 9-102(B)(1), (3), and (4), which states that an attorney who comes into possession of funds belonging to a client must promptly notify the client of receipt of the funds, maintain complete records and render appropriate accounts to his client, and promptly pay the funds to the client when requested to do so.
The evidence shows that in July of 1985 respondent received a settlement check of $3,365 on behalf of her clients Mr. and Mrs. Austin. The check was made payable to the Austins and to respondent. At the investigatory hearing held before the Committee on March 7, 1986, respondent admitted that she forged the Austin's endorsements on the check and used the money for personal expenses. She further stated that upon receiving a request from the Austins to disburse the proceeds to them, she told them that she would "get back to them." She subsequently avoided communication with the Austins, who were forced to hire another attorney to help them recover their money. Respondent testified that she made restitution to the Austins in October of 1985, after they had filed a complaint with the Committee.
We find that the evidence is clear and convincing that respondent violated: DR 1-102(A) in that she converted client funds to her own use; and 9-102(B)(4) in that she did not promptly dispurse the Austin's funds to them when requested to do so.

3. Neglect of clients' legal matters

Collectively, these cases and others suggest a recurring scenario that is growing disturbingly familiar: An attorney accepts, for a small advance, a case which will require a substantial amount of work; the attorney does not make clear exactly how much work will be done for the advanced amount; the client, however, expects that a substantial amount will be done toward solving the problem before more money is due, or expects that the remainder of the attorney's fee will be paid out of his recovery; the attorney does nothing more, keeps *278 the advance, and, if questioned, takes the position that he or she earned the fee in the first interview or with the initial research.
We believe that if the attorney either intentionally or negligently leads the client to believe that he will proceed with a substantial amount of work on the case, even though the advance is insufficient to compensate him for that work, then the attorney is bound to either perform those further services or to inform the client promptly and unequivocally that he will not do so without further compensation. This situation is analogous to that of LSBA v. Bosworth, 481 So.2d 567, (La.1986), in which this court held that an attorney-client relationship existed where the client had a subjective belief, which was justified under the circumstances, that such a relationship existed between herself and the attorney at the time that she made a loan to the attorney.
This duty is recognized in Rule 1.3 of the ABA Model Rules of Professional Conduct, which this court adopted as Rule 1.3 of the Rules of Professional Conduct, in 1987. Model Rule 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client." Comment 3 to that Model Rule states that: "Unless the relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client.... Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so." Rule 1.16 of the Model Rules, adopted by this court as Rule 1.16, Rules of Professional Conduct, states that a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if "the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled." [emphasis added]. The Rule further states that upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect the client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, and surrendering papers and property to which the client is entitled.
The three cases discussed herein point up the importance of the client's testimony in giving insight into his or her reasonable beliefs or expectations. In Sutherland the complaining former client testified, and we find the evidence of the attorney's neglect to be clear and convincing. In the Hills and Picquet cases, however, although neglect may have occurred in fact, proof of the violations is insufficient because the former clients did not testify.

(A.) Neglect of Ms. Sutherland's Legal Matter

The bar association alleges that respondent violated several provisions of the Disciplinary Rules in connection with her representation of Ms. Marilyn Sutherland. Specifically, it alleges that she violated DR 1-102(A)(1) and (6), which state that an attorney shall not violate a disciplinary rule or engage in other conduct that adversely reflects on his fitness to practice law, and DR 6-101(A)(3), which states that an attorney shall not neglect a legal matter entrusted to her.
Ms. Sutherland retained respondent to represent her in obtaining rights to her ex-husband's pension after hearing her speak at the Center for Displaced Homemakers in March and April of 1986. Ms. Sutherland testified that she paid respondent $100 for court costs and that they agreed respondent's fee would be $40 per hour, which was to be paid out of the settlement of the case, since Ms. Sutherland did not have more money to pay respondent. Ms. Sutherland's check was cashed the next day.
Ms. Sutherland testified that when she did not hear from respondent, she tried to contact her several times, but her calls were not returned. When she was finally able to get in touch with her, respondent told her a court date of May 23, 1986 had been set. Respondent returned a call from *279 Ms. Sutherland the week before the court date, and told her that the court date had been canceled because her ex-husband could not be served. The client continued to try to call respondent during June, July, and August, but her calls were never returned. Ms. Sutherland called the courthouse and learned that nothing had been filed on her behalf. When she was able to contact respondent to inquire about this, she was given another court date of September 19th. Mrs. Sutherland went to court on that date, only to learn that her case was not on the docket; she subsequently learned that no new suit had been filed on her behalf, nor had anything been filed in her divorce suit since 1981. Ms. Sutherland went immediately to respondent's office, which was closed and had mail in the door. Ms. Sutherland wrote letters to respondent, but received no answer.
Respondent's testimony conflicted with that of her client. She testified that the $100 was for legal research, and that the agreement was that her fee was $60 per hour, or $500, and that Ms. Sutherland was to make two more payments of $100 each before she went into court on her behalf, but that the remainder of the fee could be paid out of the settlement of the case. Respondent says that she earned the $100 by doing three or four hours of legal research, but never did anything further in the case because she was not paid the additional $200. She claims she copied a case on point and gave it to Ms. Sutherland between June and July of 1987. She was not certain but she believed she sent her the opinion through the mail. She also claims that the dates she gave to Ms. Sutherland were not court dates, but dates that they were supposed to meet in order for Ms. Sutherland to make the remaining payments. After being questioned by members of the Committee, respondent changed her testimony to say that her fee was to be $40 per hour, rather than $60. Respondent claimed to have time logs documenting the legal research she had done in the case, but that she had not brought them to the hearing; the Committee gave her until 5:00 p.m. that day to provide them, but she failed to do so; nor did respondent submit any document to prove the fee arrangement.
We believe that Ms. Sutherland's testimony, when compared to respondent's inconsistent and unsubstantiated version, establishes clearly and convincingly that she was led to believe that respondent would file suit on her behalf, and later that respondent had filed such a suit, when in fact she had not. Respondent's conduct was a tacit admission that she had neglected to perform the services that she had led the client to expect. Thus, we find respondent violated 6-101(A)(3) by neglecting a client matter.

(B.) Neglect of Mr. Hills' Legal Matter

The bar association alleges that respondent violated Disciplinary Rule 6-101(A)(3), which states that a lawyer shall not neglect a legal matter entrusted to her, by failing to adequately communicate with Mr. Hills and to proceed in the representation of him.
The evidence shows that in June of 1985, Mr. Frederick Hills paid respondent $100 as a retainer, with a balance due of $100, to handle a case involving the Civil Service Commission. Respondent took no action on his behalf. Mr. Hills complained by letter to the Committee on Professional Responsibility in September and again in October of 1985 that no action had been taken on his behalf and that he had been unable to reach the respondent because her phone numbers had been disconnected.
Respondent alleges that about a week after Mr. Hills retained her he was arrested on a battery charge. She claims that he left a message for her saying that he did not have the money to pay the balance of her retainer because his family was trying to raise money for his bail, and that she never heard from him again, although she claims to have sent him an announcement of her new address. Respondent also claims that she earned the $100 because she spent several hours researching his claim.
In light of the fact that Mr. Hills did not testify before the Committee, that he may have defaulted on the balance of his retainer, *280 and that he may have been notified of respondent's change of address, we do not find that the evidence is clear and convincing that respondent violated DR 6-101(A)(3). We note, however, that had Mr. Hills testified, he may have established that respondent led him to believe she would proceed with a substantial amount of work on his case, even though the advance or retainer was insufficient to compensate her for that work. We further note that respondent introduced no evidence to establish that she made it clear to Mr. Hills that she was withdrawing from his case.

(C.) Neglect of Mrs. Picquet's Legal Matter

The bar association alleges that respondent neglected a legal matter entrusted to her and failed to carry out an agreement of employment in violation of Disciplinary Rules 7-101(A)(2) and 6-101(A)(3). Respondent was retained by Mrs. Ethel Picquet in October of 1984 to represent her in a claim for damages against the Housing Authority of New Orleans. Mrs. Picquet claimed that $3000 worth of her possessions had been stolen during a move. Respondent did file a complaint and interrogatories against HANO, and HANO filed an answer denying all the allegations. The evidence shows that Mrs. Picquet sent a letter in September of 1985 to the Committee, complaining that she had been unable to contact respondent by phone or at her office to obtain news about her case, that she did not know how to contact her, and that she needed her papers.
Respondent claims that HANO gave notice of the taking of Mrs. Picquet's deposition in October of 1985, but Mrs. Picquet refused to attend. Respondent claims that at that point she told Mrs. Picquet that she would no longer represent her, sent her a copy of her file, and filed a motion to withdraw as counsel of record. The evidence shows that respondent sent a letter to Mrs. Picquet in October of 1985 (after a complaint had been filed with the Committee) notifying her that she was no longer representing her and would soon be filing a motion to withdraw as counsel of record, but respondent had no evidence to show that a motion to withdraw was actually ever filed.
Mrs. Picquet did not testify before the Committee. In light of the evidence that Mrs. Picquet failed to attend a scheduled deposition and that respondent sent her a letter terminating her representation, we do not find that there is clear and convincing evidence that respondent failed to carry out an employment contract or neglected a client matter in connection with her representation of Mrs. Picquet.

SANCTIONS
Respondent violated the disciplinary rules in two instances by converting client funds to her own use and in one instance by neglecting a client's legal matter. Consequently, sanctions must be imposed. The bar association urges that we disbar the respondent. Because we conclude that the ultimate sanction of disbarment is the appropriate sanction for the two infractions of conversion, it is not necessary that we impose a sanction for the neglect violation.
The most serious breach of an attorney's duty to her client is the intentional conversion of the client's property to the attorney's own use. The ABA Standards for Imposing Lawyer Sanctions provide: "Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." Standard 4.11. The comments to that section state that in instances where an attorney's lack of integrity is clear, only the most compelling mitigating circumstances should justify a penalty less than disbarment.
Similarly, in Louisiana State Bar Association v. Hinrichs, 486 So.2d 116 (La. 1986) this court set forth general guidelines for the imposition of sanctions. We noted that disbarment is the usual penalty in cases where the attorney "... acts in bad faith and intends a result inconsistent with his client's interest; the lawyer commits forgery or other fraudulent acts in connection with the violation; the magnitude or the duration of the deprivation is extensive; the magnitude of the damage or risk of *281 damage, expense and inconvenience caused the client is great; the lawyer either fails to make full restitution or does so tardily after extended pressure of disciplinary or legal proceedings." 486 So.2d at 122.
In this case, respondent has admitted to intentionally, knowingly taking several thousand dollars each from two separate clients and spending those funds on personal expenses. In both instances, the funds represented compensation for the client's personal injuries. She further refused to render an accounting to the clients when requested to do so. One of those clients, Ms. Nettles, was incarcerated, without the ability to personally check on the status of her financial affairs. Another was a minor whom the respondent defrauded by pretending to establish a trust account for his benefit while circumventing the protections of his tutorship. The record contains many letters, painstakingly written over many months, which Ms. Nettles was forced to write to respondent, to her son's trust account representative, and to the bar association in attempts to determine the status of her own and her minor son's funds. At the hearing before the Commissioner respondent admitted that she still owed Ms. Nettles $4600 of those funds. The Austins were forced to hire another attorney to attempt to recover their funds from respondent. Thus, it is clear that all of these clients were injured by respondent's actions. A prima facie case for disbarment clearly has been presented.
ABA Standard 9.22 sets forth aggravating circumstances which may be considered in imposing an even stricter sanction than would otherwise be justified. Respondent's case involves the listed factors of: (b) dishonest or selfish motive; (c) a pattern of misconduct; and (d) multiple offenses. Furthermore, we note Hinrichs stated that "forgery or other fraudulent acts in connection with the violation" justifies a sanction of disbarment. 486 So.2d at 122. Respondent deprived the Austins of funds by forging their endorsements on the settlement check made payable to them and to respondent. With respect to the respondent's conversion of the Nettles' funds, additional aggravating factors are present: (h) vulnerability of the victims; and (j) an indifference to making restitution.
Even more reprehensible is the utterly dishonest conduct of the defendant amounting to the perpetration of fraud upon a tribunal in her fabrication of evidence to cover up her conversion of these funds. The record clearly establishes that she visited Ms. Nettles in prison and induced her to sign fraudulent receipts by telling her that if she did not sign them, she would not or could not repay her the money that she had stolen; she then introduced these fraudulent receipts into evidence at the hearing before the committee, and when confronted by the committee with the counter-document which she had executed admitting the receipts to be fraudulent, she had no explanation and invoked her 5th Amendment privilege. ABA Standard 9.22(f) lists "submission of false evidence, false statements, or other deceptive practices during the disciplinary process" as an aggravating factor justifying an even stricter sanction than would otherwise be imposed.
Equally deserving of censure, and perhaps more harmful, was her flouting of the law by circumventing the tutorship designed to protect the minor's property and depriving him of the funds intended to compensate him for his personal injuries.
ABA Standard 9.32 lists mitigating factors which may justify a reduction in the degree of discipline that would normally be imposed. Here, it appears that the only mitigating factors are (a) absence of a prior disciplinary record; and (c) personal or emotional problems. Respondent was admitted to the practice of law in 1983. She claims that she was very competent in the handling of her clients' affairs until November, 1984. She stated that she had two children and that the burden of supporting the family was on her shoulders as her husband was frequently unemployed. Furthermore, she claims that he was abusive to her and uncooperative in helping with the children while she attempted to practice law. She stated that she developed a problem with alcohol for a period of time. In early 1985 she left her husband for a month, but returned. Starting in *282 June, 1985, she did not go into her office on a regular basis, and she claims that on June 30, 1985, her husband beat her and she and the children left him, this time permanently. She claims that she feared for her life, and thus could not divulge her whereabouts to anyone who knew her husband. It was during this period of time that she converted the funds belonging to the Austins, believing that she would soon be able to replace them with funds from an anticipated settlement in another case. She also testified that she had been very depressed, but had recently begun therapy to work on her personal problems. Although the Commissioner appointed by this court requested that she submit a report by her therapist and gave her two additional weeks after the close of the hearing to do so, respondent never submitted a report or proof of any nature that she was in therapy.
Timely restitution is a mitigating factor that may be considered in a disciplinary case. ABA Standard 9.32(d). Although the respondent submitted evidence at the hearing before the Committee that she had made at least partial restitution to the Austins, she admitted that this was not done until after the Austins had hired another attorney and had filed a complaint with the Committee on Professional Responsibility. Respondent admitted at the hearing before the Commissioner that she had not made restitution of $4600 belonging to the Nettles.
Remorse and previous good character or reputation are additional mitigating factors that may be considered. ABA Standard 9.32(g) and (l). At the hearings before the Committee and the Commissioner, respondent stated that she was remorseful for what she had done, and did not believe that it would happen again. Ms. Sonja Sampson, a friend of respondent's since law school, testified that she was a dedicated, aggressive attorney. She also testified that she did not believe respondent would have committed the violations were it not for the financial and marital problems which she was having at the time, and that respondent had since made a transition to being a dedicated, hardworking attorney. Mr. Willie Williams, respondent's legal assistant, also testified on her behalf. He stated that she was remorseful for what she had done and that he believed she was an honest person.
However, we find that these mitigating factors are insufficient to significantly detract from the seriousness of respondent's misconduct. The respondent has committed the most serious breaches of her professional duty to her client. As we noted in Louisiana State Bar Association v. Krasnoff, 488 So.2d 1002 (La.1986), personal adversity of an attorney cannot excuse the failure to deposit client's funds in a separate account, to refrain from removing or using those funds unless due him beyond dispute, and to deliver funds owed the client when requested. 488 So.2d at 1007.
Even if respondent had proved her personal adversity beyond any doubt, we could not depreciate the gravity of her violations. Moreover, we note that there is cause to be skeptical of some of her mitigatory evidence. She offered no professional corroboration of her self-diagnosis of depression. Her therapy consisted of only three visits to a social worker counselor prior to the hearing. Even this was not corroborated. Furthermore, we note that respondent received approximately $16,000 in attorney's fees from the Nettles settlement in November of 1985. For this reason, it is especially difficult to accept her story that she was forced by financial need to convert her clients' funds. Further, her account of how she was placed in such desperate circumstances is not reliably or convincingly corroborated, and inconsistency is the hallmark of her story. On the one hand, she professes to have been a competent, dedicated attorney, but on the other she was unable to avail herself of any remedy the law provided for the abuse by her husband. At one point she stated that she had a problem with using alcohol "as a means of escaping into another world," yet later denied having an alcoholic problem and testified that she had used alcohol "in order to go to sleep." At times she purported to admit her transgressions and to be ready to accept the consequences, but at others she sought to cast the blame on her husband, her family, and even her mother. She professed to be remorseful and determined to *283 make full restitution. Yet she treated herself to a new and, in her words, "very, very plush" office instead of restoring her clients' funds. Respondent professed to be effectively rehabilitated and ready to devote herself fully to her profession, yet at the time of the Commissioner's hearing she said she was studying to be a tourist information specialist and was planning to open a religious book store.
Respondent's personal hardship does not mitigate substantially her repeated and, in the minor child's case, somewhat calculated and systematic conversion of her clients' funds. The presence of serious aggravating circumstances, including the fabrication of fraudulent evidence in an attempt to cover up her misdeeds, militates against reducing the degree of sanction below that of disbarment.

Decree
For the reasons assigned, it is ordered that the names, Margaret G. Ford and Margaret G. Ford Williams, be stricken from the roll of attorneys and that respondent's license to practice law in the State of Louisiana be revoked and cancelled at her cost, with readmission conditioned on proof of full restitution of all funds of her clients, the Nettles, the Austins, and Ms. Sutherland.
ATTORNEY DISBARRED.
NOTES
[*] Hall, Chief Judge, Court of Appeal, Second Circuit, Associate Justice Pro Tempore, sitting for Lemmon, Justice, who did not participate in this decision.