869 So.2d 934 (2004)
EXPOSITION PARTNER, L.L.P. and ICMC Investors, L.L.C.
v.
KING, LEBLANC & BLAND, L.L.P.
No. 2003-CA-0580.
Court of Appeal of Louisiana, Fourth Circuit.
March 10, 2004.
Rehearing Applications Denied April 27, 2004.
*936 Gladstone N. Jones, III, Peter N. Freiberg, Jones, Verras & Freiberg, L.L.C., and James M. Garner, Peter L. Hilbert, Jr., Timothy B. Francis, Martha Y. Curtis, Sher Garner Cahill Richter Klein McAlister & Hilbert, L.L.C., New Orleans, LA, for Plaintiff/Appellant.
Phillip A. Wittmann, Paul J. Masinter, Samantha Griffin, Stone Pigman Walther Wittmann L.L.C., New Orleans, LA, for Defendants/Appellees (Gardere Wynne & Sewell And Frank Putman).
John E. Galloway, J. Michael Daly, Jr., Galloway, Johnson, Tompkins, Burr & Smith, New Orleans, LA, for Defendant/Appellee (King LeBlanc & Bland, L.L.P.).
(Court composed of Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS Jr., Judge LEON A. CANNIZZARO JR.).
MICHAEL E. KIRBY, Judge.
This appeal arises out of the dismissal on an Exception of No Right of Action of a large number of claims by Exposition Partners, L.L.P. ("Exposition") against the law firm of King, LeBlanc & Bland, L.L.P.("KLB"), and dismissal of defendants, Gardere Wynne & Sewell, L.L.P. ("GWS"), and Frank Putman, Esq., on an exception of lack of in personam jurisdiction. KLB, GWS and Mr. Putman acted as transactional attorneys in several business dealings and litigation. Exposition filed suit alleging that defendants committed malpractice; breached contractual and fiduciary duties; operated under a conflict of interest; committed fraud; breached the Code of Professional Conduct; and committed acts or omissions on which Exposition detrimentally relied.
This dispute arose from a nationwide class action settlement in White v. General Motors Corporation, 97-1028 (La.App. 1 Cir. 6/29/98), 718 So.2d 480. In the settlement agreement, General Motors (G.M.) agreed to issue to all class members certificates worth $1000.00 that could be used toward the purchase of new GM vehicles.
A Louisiana resident, William F. Ryan and his corporation, are the partners of Exposition Partners, L.L.P. ("Exposition"), *937 which is a member of ICMC Investors, L.L.C. ("ICMC"). ICMC's original members were Mr. Ryan and Boyd L. McPhail, another Louisiana resident. Mr. Ryan and Mr. McPhail are/were co-managers of ICMC.
In order to create a secondary market for the $1000.00 GM certificates, ICMC decided to form a company with the help of businessmen, James Dawley and Donald McGill. Mr. Ryan wanted to purchase these certificates at discounted rates and then re-sell them to third parties. Mr. Ryan's idea made these settlements more beneficial to the GM customers because the rebate certificates became economically fungible.[1]
On January 30, 1997, the company DMMR, L.L.C. (presumably to represent Dawley, McGill, McPhail and Ryan) (hereinafter "DMMR") was formed as a Louisiana limited liability company with its registered office in Metairie, Louisiana. The membership of DMMR, L.L.C. consisted of the following: ICMC, represented by Mr. Ryan; Dawley Seven, Ltd., represented by its general partner, Dawley Certificate Corp., through its President James Dawley; and Don McGill Four, Ltd., represented by its general partner RMA, Inc., through its President Don McGill.
The Operating Agreement of DMMR was notarized by a Texas Notary and contained the signature of Mr. Putman in several places. Mr. Putman, is an attorney licensed in Texas and a partner of GWS, a law firm with offices in Houston. Acknowledgments included with the operating agreement, which are in the record, took place in Houston.
Mr. Putman had served as Mr. Dawley's legal counsel prior to serving as DMMR's transactional attorney.
In the record is an engagement letter dated November 19, 1997 from the law firm of GWS to Certificate Redemption Group, L.L.C. ("CRG"). Mr. Putman signed the letter and addressed it to Mr. Dawley at his Houston address. It engages GWS as counsel for the general matters of CRG. As will be discussed later, this letter is noteworthy because according to the record, CRG did not yet exist. It was not until March 16, 1998, that an Amendment occurred changing the name of the company DMMR to CRG. Other changes also occurred and are discussed infra.
Multiple lawsuits arose as Messrs. Ryan, Dawley, McGill and McPhail all sought tactical advantages to enhance their positions within the company. It is alleged that Mr. Ryan and Mr. McGill brought suit against Mr. Dawley in another matter. Exposition alleges the final result of the litigation left Mr. Ryan without an ally on the management committee, and Mr. Dawley in control of the company. The original operating agreement provided that three of the four members were required to make an amendment and the other three members did amend several critical aspects of the original operating agreement.
In January 1998, GWS invoiced CRG for an eighteen minute telephone call to Keith McIntosh, a CRG employee, concerning a meeting and a "memo to Louisiana law firm; amendments to the LLC." Mr. Putman in his deposition identified KLB as the Louisiana law firm. A review of the billing statements leads a reasonable person *938 to conclude that GWS and KLB worked together on the amendments to the operating agreement. GWS did not do it alone because there were Louisiana legal issues involved. Mr. Putman testified that there was a "joint project" between GWS and KLB representing CRG.[2]
On February 17, 1998, Mr. Ryan sued other members of the CRG Management Committee, Messrs. McGill, Dawley, and McPhail, in Louisiana for injunctive relief over amendments to the CRG operating agreement. CRG, acting through Messrs. Dawley, McGill and McPhail, retained KLB to represent them. Also in February of 1998, Mr. McPhail filed a Petition for Dissolution of ICMC in the 24th Judicial District Court.
Subsequent to the Petition for Dissolution in February 1998, Messrs. McPhail and Ryan agreed to dissolve ICMC so that ICMC's interest in CRG could be transferred to Exposition and the McPhail Company.[3] Then Exposition and McPhail Company could complete the stage to become members of CRG.
On March 16, 1998, the First Amendment occurred which changed the name from DMMR to CRG. Although the registered office remained in Metairie, a clause was added to the agreement which could later facilitate the move of the company's office to Houston. Also Section 5.3 of the operating agreement, a Non-competition by Members clause, was deleted in its entirety.[4] An Addendum to Section 14.8 granted preemptive rights to additional entities which would be created and altered the percentages of interest among the members. Thus, on May 25, 2000, Mr. Dawley formed Certificate Redemption Group I located in Houston, similar to CRG but with terms more favorable to Mr. Dawley. The Amendment of CRG also completely revamped the management, vesting management authority with Mr. Dawley. The CRG Management Committee consisted of ICMC represented by Mr. Ryan and Mr. McPhail, as well as Mr. McGill, and Mr. Dawley. The Amendment of the operating agreement once again contained Mr. Putman's name in several places. Mr. Ryan's signature is on this First Amendment.
On April 3, 1998, pursuant to a Consent Judgment rendered in the 24th Judicial District Court in Jefferson Parish, it was ordered that:
in the event of the dissolution of ICMC Investors, L.L.C., the two members of ICMC Investors, L.L.C. ...shall become members of Certificate Redemption Group, L.L.C. in the same status as ICMC Investors, L.L.C.
Thus upon ICMC's dissolution, Exposition was to become a member of CRG and assume its position thereby making it the largest recipient of the cash flow generated by CRG from the GM certificates.
On June 30, 1998, Grant Coleman of KLB, allegedly as counsel for Mr. McPhail and McPhail Company only, sent drafts of dissolution documents for Mr. Gary Elkins to review along with a letter setting forth the dissolution procedure and asking for Mr. Elkins' comments. KLB claims they did so at the request of Mr. Elkins, as counsel for Mr. Ryan, Exposition and ICMC.
*939 On July 1, 1998, Mr. Dawley paid Mr. McPhail three hundred thousand dollars ($300.000.00) for two (2%) percent of his interest in CRG. Also in July 1998, Mr. McPhail informed KLB that he did not want to go forward with the ICMC dissolution allegedly because of a claim that had arisen against ICMC by Certificate Clearing Corporation.[5] At its client's request, KLB had no further involvement in the dissolution of ICMC after July 1998. Mr. Elkins evidently took no further action as attorney for Mr. Ryan, Exposition and ICMC to dissolve ICMC or to make Exposition a member of CRG.
On July 23, 1998, Mr. Putman traveled to New Orleans to represent CRG's interest in the class action at the Louisiana Automobile Dealers Association Conference. Throughout CRG's existence, GWS had reviewed and drafted court documents in the Louisiana class action lawsuit.
In June 2001, Exposition offered to purchase the interests of the other three members of CRG[6] or be bought out and the defendants allegedly advised the other members of CRG that they could reject Exposition's offer to purchase or sell their interests in the company without obligation by claiming that Exposition was not a member.
On July 19, 2001, Exposition and ICMC filed this action. ICMC's action was transferred to Jefferson Parish.
Exposition, through its general partner, W.F. Ryan Enterprises, Inc., through its president William F. Ryan, alleges in its Petition that Exposition is a member of CRG because it has been treated as a member in documents and in fact and that, as a member, it has an attorney-client relationship with GWS, Mr. Putman and KLB. Mr. McPhail's deposition confirms that even in August of 1998, Mr. McPhail believed that Exposition and his McPhail Company were members of CRG and were treated as such.
Exposition alleges in Paragraph 44 of its Third Amending And Supplemental Petition for Damages that:
From September of 2000, defendants, King, LeBlanc & Bland, L.L.P., Gardere Wynne & Sewell, L.L.P., and Frank Putman, intentionally concealed the fact that ICMC Investors, L.L.C. had not been dissolved and that Exposition Partners, L.P. [sic] was not formally admitted as a member of Certificate Redemption Group, L.L.C.
The following paragraph, Paragraph 45, states:
By intentionally concealing the foregoing, defendants committed a fraud by misrepresentation, suppression of the truth, silence and/or inaction with the intention to obtain an unjust advantage in the favor of the other members of Certificate Redemption Group, L.L.C. and against Exposition Partners, L.P. [sic]
The Third Petition states that defendants have acted in a manner detrimental to CRG by serving both as attorneys for CRG and as attorneys for Messrs. Dawley and McPhail in their individual capacity, which created conflicts of interest.
Exposition contends that as a result of the failure to properly effectuate the dissolution of ICMC, it has been damaged in its ability to purchase the ownership interest *940 of the members of CRG or be bought out, by means of the operating agreement's Section 5.8 "bouray buyout" clause.[7] This clause gives a member rights to purchase or sell at a set price. This is the basis for the last allegation of damages of the Third Petition, Paragraph 77, which states:
Defendants are therefore liable, jointly, severally and in solido, for the damages caused to plaintiff in the amount that the other members of Certificate Redemption Group, L.L.C. failed to pay plaintiff as the purchase price due under the terms of its offer pursuant to Section 5.8 of the Certificate Redemption Group, L.L.C. Operating Agreement, or, alternatively, an amount equal to the reasonably demonstrable future income of Certificate Redemption Group, L.L.C. less the purchase price in plaintiff's offer pursuant to Section 5.8 of the Certificate Redemption Group, L.L.C. Operating Agreement, plus all costs, expenses, legal fees, and foreseeable and unforeseeable damages incurred by Exposition Partners, L.P. [sic]
In summary, plaintiff's petitions and its three amendments alleged claims arising from fraud, legal malpractice, breach of contract, fiduciary duty, detrimental reliance, damages from conflicts of interest and violations of rules of professional conduct.

ACTION OF THE TRIAL COURT
The trial court first dismissed without prejudice the derivative claims[8] of ICMC brought by Mr. Ryan against KLB and GWS. This allowed Mr. Ryan to bring his derivative action to enforce the rights of ICMC, especially those of legal malpractice, in Jefferson Parish against the other defendants in this case. There is documentary proof that ICMC was a member of CRG at one time and thereby has rights. Thus, the suit in Jefferson Parish will determine the rights and obligations of ICMC, and indirectly Mr. Ryan as a member of ICMC, in regards to CRG and the defendants who have been employed as CRG's legal counsel.
Subsequently, Exposition, and indirectly Mr. Ryan as its member, was the only plaintiff left in the Orleans Parish suit. The trial court dismissed Exposition's suit for damages by granting defendants' Exception of No Right of Action because the plaintiff Exposition, has no documentary proof of being a member of CRG, or having an attorney-client relationship with the legal counsel employed by CRG, even though Exposition alleges it was fraudulently led to believe itself a member.

*941 STATEMENT OF THE LAW

Standard of Review
When the trial court's ruling on a peremptory exception is based on factual conclusions made after receiving evidence, the appellate court standard of review is that of manifest error. Abbott v. Louisiana State University Medical Center-Shreveport, 35,693, p. 5 (La.App. 2 Cir. 2/27/02), 811 So.2d 1107, 1110. In this matter the trial court received documentary evidence prior to ruling. For that reason our standard of review of its findings is that of manifest error.

Evidentiary Rule
At a contradictory hearing, on the exceptions of no right of action and lack of personal jurisdiction, evidence is admissible to resolve the exceptions. La.Code of Civ. Proc. arts. 930-931. If evidence is admitted at such a hearing, the exceptions must be resolved on the evidence presented, rather than on the allegations in the petition. Phillip v. Home Ins. Co., 95-406, p. 6 (La.App. 5 Cir. 2/27/96), 671 So.2d 943, 947 ("when evidence is presented [at a hearing on an exception], then the issue must be decided on the evidence submitted").
In de Reyes v. Marine Management & Consulting, Ltd., 586 So.2d 103, 109 (La. 1991), an evidentiary rule was established that shifted the burden of proof: at a contradictory hearing on an exception of lack of personal jurisdiction, the plaintiff must "prove facts in support of her showing that jurisdiction was proper by a preponderance of the evidence." See also Hunt v. Schult Homes Corp., 94-1592, p. 5 (La.App. 3 Cir. 5/3/95), 657 So.2d 124, 127.
In the proceedings, GWS and Mr. Putman asserted the exception of lack of personal jurisdiction and GWS and KLB asserted the exception of no right of action. The trial court conducted contradictory hearings on the exceptions on three separate days. At the hearings, the trial court permitted the parties to introduce documentary evidencethe defendants in support of the exceptions and the plaintiff in opposition. Defendants' documentary evidence was submitted without objection and plaintiff's documentary evidence was submitted without objection except as to one document. In addition, before and after the hearings, the parties submitted legal memoranda, proposed findings of fact, and proposed conclusions of law. However, the plaintiff was not allowed to put on live testimony.

Exception of No Right of Action
An exception of no right of action challenges whether the plaintiff has a real and actual interest in the case and should be maintained when the plaintiff does not have an interest in the subject matter of the suit or legal capacity to proceed with suit in a particular case. Louisiana Paddlewheels v. Louisiana Riverboat Gaming Comm'n, 94-2015, p. 4 (La.11/30/94), 646 So.2d 885, 888, (citing La.Code Civ. Proc. art. 681). Because the vast majority of the claims in this case involved ICMC's real and actual interest in CRG as a documented member/partner, upon the trial court's transfer of ICMC's claims to another venue, these claims could not be asserted by Exposition as they were derivative claims.[9] More specifically we refer to the claims regarding alleged acts of malpractice within the context of an attorney-client relationship.
We find, as the trial court did, that ICMC is the proper party plaintiff for the great majority of the actions brought in this case, because only ICMC, as a member, can assert the rights of CRG against *942 its attorneys. We also concur with the trial court on its finding that no legal representation was proven at the hearing on the exception of no right of action. To elaborate we adopt part of the Reasons for Judgment of the learned Judge below:
Nor could Exposition demonstrate the existence of any tacit agreement of legal representation by the defendants to perform any legal services, including the dissolution of ICMC. Mr. Ryan contended he had a reasonable expectation of legal representation by the defendants. However, a person's subjective belief that an attorney represented him must also be reasonable under the circumstances. (FN. Louisiana State Bar Ass'n v. Williams, 549 So.2d 275 (La. 1989).) This court finds not only do the facts and circumstances surrounding this case demonstrate the lack of an attorney-client relationship between Exposition and the defendant law firms, but also crystallize the imprudence of plaintiff's expectations and subjective beliefs to the contrary. Indeed, since early 1998, Exposition and Mr. Ryan have been involved in several lawsuits against GWS and Mr. Putman's clientsCRG, Mr. Dawley and Dawley Seven. (Emphasis in original).

Fraud Claims
Nonetheless, we find Exposition's pleading of fraud, intentional concealment and detrimental reliance are not subject to the exception of no right of action because they do not depend upon the existence of an attorney-client relationship. The issue here is whether the attorneys aided and abetted fraud or whether by their acts caused damage to another.
Whenever a juridical person is created, internal conflicts can arise because it can only act through a member or its members. Here, the self interests of Mr. Ryan and Mr. Dawley were contrary to each other, as well as at odds with the theoretical best interest of CRG, to which they belonged via other entities. It is conceivable that a conflict of interest, or fraud, could arise between a transactional attorney who represents a limited liability company and an individual member of the limited liability company, or a subset thereof.
Because the law classifies CRG as a distinct business entity, GWS, Mr. Putman and KLB allege that at no time were they retained to represent Mr. Ryan, Exposition or ICMC. Nevertheless, CRG can only act via Messrs. Dawley, McPhail, Ryan, etc. The premise for defendants' argument is that representing CRG posed no conflict of interest vis-à-vis the distinct members of CRG.
The Louisiana State Bar Association's Rules of Professional Conduct Provide in Rule 4.1
In the course of representing a client a lawyer shall not knowingly:
(a) Make a false statement of material fact or law to a third person; or
(b) Fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.[10]
Rule 1.7(b) that deals with conflict of interest and states:
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

*943 (1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
Finally, Rule 1.13, dealing with an organization that is a client, states:
(d) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.
(e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.
LSBA, Articles of Incorporation, Art. 16, Ch. 4 App. following La. R.S. 37:222
In the case of GWS, we also find enlightening Comment 3 to Texas Rule 1.12, which recognizes that there are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such a case the attorney has a duty to warn.
On February 26, 2001, Mr. Putman addressed a letter on behalf of GWS to all members of CRG, including Exposition and McPhail Company and excluding ICMC. The letter begins:
Exposition Partners, L.P. [sic] and Bill Ryan have recently raised questions about the continuing representation of Certificate Redemption Group, L.L.C. ("CRG") by this firm while at the same time representing Dawley Seven, Ltd. ("Dawley Seven") and James R. Dawley, individually ("Dawley").
Given Mr. Ryan's sophistication we do not read this letter to create an attorney-client relationship. Nevertheless, the absence of the real documentary member, ICMC, from this and other official CRG correspondence gives Exposition, which is an entity distinct from Mr. Ryan, the right to plead it was fraudulently misled.
We find the November 19, 1997, engagement letter signed by Mr. Putman and addressed solely to CRG via Mr. Dawley produces a possibility of fraud. The reason is that CRG was not the official name of DMMR until the First Amendment of the operating agreement was signed in March 16, 1998. Moreover, at this point in time, the registered office was in Metairie, Louisiana, not Houston, Texas. Furthermore, at that time there were two managers for DMMR, i.e. Mr. Dawley and ICMC, represented by Messrs. Ryan and McPhail. We found no similar engagement letter in the voluminous record sent to ICMC's representatives.
After 1997, Mr. Putman, using the GWS letterhead, addressed several letters to all of the partners, including Exposition but not ICMC. As late as June 20, 2001, Mr. Dawley sent correspondence to Mr. Putman, Exposition and the McPhail Company, while not including ICMC. The minutes of CRG's meetings also include Exposition listed along with other members. Without proving fraud, the fact that ICMC was excluded and Exposition was included in CRG's official correspondence gives it a right to allege fraud or that it was being misled, even if *944 in fact this amounted to nothing more than documentary confusion.
Exposition's intentional tort claim involves primarily the allegations that the defendants knew of the obviously material fact that ICMC had not been dissolved and yet intentionally concealed this fact, and in doing so aided and abetted in committing a fraud by misrepresentation and suppression of the truth. During discovery the defendants properly took advantage of their attorney-client privilege.
These allegations of negligent misrepresentations and fraud provide Exposition a right of action, even though no attorney-client relationship exists. Such allegations do not constitute proof, but they do create a right of action. For as La. Civil Code Article 2315 states: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The motive for fraud is present as an attorney's economic interest are most certainly at stake as well as the desire to maintain a client's business.[11]
In summary, the exception of no right of action is overruled as to Exposition's fraud claim against KLB, GWS and Mr. Putman.

Exception of Lack of Personal Jurisdiction
The Louisiana Long Arm Statute, La. R.S. 13:3201(B), grants the exercise of personal jurisdiction over a nonresident on any basis consistent with the Constitution of the United States, namely the Due Process Clause. Under the Due Process Clause of the Fourteenth Amendment, jurisdiction is proper if a nonresident defendant established minimum contacts with the state and maintenance of the suit does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amends. V, XIV.
The purpose of the due process minimum-contacts analysis is to protect the defendant from being hauled into court when its relationship with Louisiana is too attenuated to support jurisdiction, and accordingly, the court focuses upon the defendant's activities and expectations in deciding whether it is proper to call him before a Louisiana court.
Specific jurisdiction is personal jurisdiction based on contacts with the forum state that are related to the particular controversy. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A court has specific jurisdiction over an out-of-state defendant "if the defendant has `purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that `arise out of or relate to' those activities." Burger King, Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). Although not an independent component of the minimum contacts analysis, "foreseeability" is a significant consideration in determining whether there is a substantial connection between a nonresident defendant and the forum state for due process purposes. U.S.C.A. Const. Amend. XIV.
Mr. Putman, acting on behalf of GWS, formed CRG using Louisiana law. Fifty percent of the ownership of CRG was based in Louisiana. CRG's registered office was in Louisiana. In all, Mr. Putman made no less than three visits to Louisiana in representation of CRG. A more detailed review reveals: (1) GWS and Mr. Putman made 35 contacts by telephone, in person *945 meetings, letter and facsimile transmittals with Mr. Ryan (a Louisiana resident and principal of Exposition) between December 1996 and March 2001; (2) GWS and Mr. Putman had a minimum of 26 contacts with KLB (a Louisiana law firm) by memorandum, letter, in-person meeting in New Orleans, facsimile transmittals and telephone between January 1998 and June 2001; (3) GWS and Mr. Putman had a minimum of 22 contacts with Jack Stolier, a New Orleans attorney representing the objectors to the General Motors settlement, by in-person meeting, telephone, facsimile transmittal and review of legal briefs between August 1998 and January 2001; (4) GWS and Mr. Putman made no less than 43 contacts with Mike Crow, a New Orleans attorney representing class counsel in the General Motors litigation, by in-person meetings, letter, telephone conference, preparation of contracts, and review of legal court documents, between March 1998 and the trial; (5) GWS and Mr. Putman made 69 contacts with McPhail (a Louisiana resident), an executive vice-president of CRG and a principal of a member of CRG and a member of ICMC, by telephone, letter, and in-person meetings, between October 1997 and the present; (6) GWS and Mr. Putman made 10 contacts with Bruce Kingsdorf and Henry Kinney, both New Orleans attorneys, by telephone and letter between November 1997 and February 1998 on CRG matters; and (7) GWS and Mr. Putman made 6 contacts with Donald W. Doyle, Jr. and John C. Reynolds, Mr. Ryan's brother-in-law, by telephone and letter in January 1998. These contacts were made by Mr. Putman in an attempt to negotiate the sale or purchase of Mr. Ryan's interest in CRG. These are just some factors related to Exposition's claim of jurisdiction.
Moreover, the raison d'etre of CRG as stated in its operating agreement, that GWS and Mr. Putman wrote, was to create a secondary market for certificates to be issued from a class action lawsuit in a Louisiana court. Many of these class action plaintiffs were Louisiana residents. Thus, the business opportunity that CRG sought to take advantage of was in Louisiana.
We distinguish We're Talkin' Mardi Gras LLC v. Davis, 192 F.Supp.2d 635 (E.D.La.2/25/02), for in this case it was not "mere fortuity" that one of CRG's members was a resident of Louisiana: but for the Louisiana class action lawsuit, CRG would not exist. For similar reasons First Trust Nat'l Ass'n v. Jones, Walker, Waechter, Poitevent, Carrere & Denegre, 996 F.Supp. 585 (S.D.Miss.1998) is distinguishable: first because of the differences between Mississippi's Long Arm Statute and that of Louisiana, and more importantly because here we are dealing with alleged intentional acts and fraudulent business activity, which did not exist in the First Trust Nat'l Ass'n, supra.
More significantly we cite Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) for the proposition that when intentional acts occur and the effects are foreseeable in forum "x", then forum "x" is a proper forum.[12]Waffenschmidt v. MacKay, 763 F.2d 711 (5th Cir.1985). Here, defendants are charged not with mere untargeted negligence, but rather with intentional and fraudulent actions aimed at a Louisiana resident, the effects of which allegedly caused economic loss to Exposition in Louisiana.
In this case, taking the allegations in the plaintiff's petition as true and the documented facts, it follows that Louisiana is a foreseeable forum. GWS and Mr. Putman, whose offices are in Houston, Texas, have sufficient minimum contacts with Louisiana, *946 related to this particular controversy so as to make them amenable to suit here. The totality of the circumstances make its reasonable for us to conclude that GWS and Mr. Putman could foresee their actions leading them into litigation in New Orleans. For that matter, it already had led them to file various suits in Louisiana. As stated earlier, because of the business of CRG, defendants were already involved, albeit indirectly, in litigation in Louisiana. For these reasons we reverse the granting of the exception of lack of personal jurisdiction and find specific jurisdiction exists.
In summary, we affirm the granting of the exception of no right of action as concerns all other derivative claims, except the claims for fraud and negligent misrepresentation against KLB, GWS and Mr. Putman, which may be based upon their alleged actions that harmed Exposition. The claim of fraud by Exposition is not amenable to dismissal on an exception of no right of action.
Therefore, we reverse and remand on Exposition's sole claim of fraud against KLB, GWS and Mr. Putman.
REVERSED AND REMANDED IN PART; AFFIRMED IN PART
NOTES
[1] Nevertheless, a recent ruling by the First Circuit restricted the transferability of the certificates until after issuance to a class member, thereby having a potentially adverse effect on the business of Certificate Redemption Group, L.L.C. White v. General Motors Corp., XXXX-XXXX (La.App. 1 Cir. 12/20/02), 835 So.2d 892.
[2] In discovery Mr. Putman did not divulge the content of this matter citing the attorney-client privilege.
[3] A business entity created to shield Mr. McPhail from liability.
[4] This allowed Mr. Dawley to form another company which would perform the same function as per Mr. Ryan's original idea and thus dilute his share of the profits or use of same as leverage.
[5] This is another company with whom ICMC did business, and allegedly owed money.
[6] However, the defendants maintain that Exposition was never admitted as a member of CRG by unanimous vote (as required by Article 5.6 of the operating agreement, as amended), and that Mr. Ryan (as representative of ICMC) declined to vote in favor of Exposition's admission.
[7] Both the original Section 5.8 of the Operating Agreement of CRG and Section 5.8, as amended pursuant to the First Amendment dated March 16, 1998, provide for a so-called "bouray" buyout arrangement between the members. This proposed buyout provision, in its most elemental form, allowed one member or group of members of CRG to offer to buy the interests of the other member or group of members at a specified price. The member who received such an offer to purchase would then have to agree to sell his membership to the offeror, or purchase the interests of the offeror at the offeror's price.

Plaintiff, Exposition, maintains that in June 2001, it offered to purchase the interests of the other three members of CRG. However, the defendants maintain that Exposition was never admitted as a member of CRG by unanimous vote (as required by Article 5.6 of the operating agreement, as amended), and that Mr. Ryan (as representative of ICMC) declined to vote in favor of Exposition's admission.
[8] In a derivative suit or claim in this context, a shareholder [or limited partner] sues on behalf of the corporation [or partnership] for harm done to the corporation [or partnership]. Lenz v. Associated Inns and Restaurants Co. of America, 833 F.Supp. 362, (S.D.N.Y.1993), as opposed to an action for personal injury to oneself.
[9] As a member of CRG, ICMC can assert claims and rights that pertain to CRG.
[10] Rule 1.6 treats the topic of information that is confidential to the client.
[11] See Ronald J. Gilson, The Devolution of the Legal Profession: A Demand Side Perspective, 49 Md. L.Rev. 869.
[12] Calder is noted as creating the "effects" test.